In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00353-CV
_____

STEVEN PAUL WATSON AND LACEY WATSON, Appellants

V.

DAVIS-WOODS SUBDIVISION ARCHITECTURAL COMMITTEE,
Appellee

On Appeal from the 258th District Court
Polk County, Texas
Trial Cause No. CIV22-0533

MEMORANDUM OPINION

Appellee the Davis-Woods Subdivision Architectural Committee ("the Committee") sued Appellants Steven Paul Watson and Lacey Watson (individually, "Paul" and "Lacey," collectively, "the Watsons") for installing a fence that did not comply with a restrictive covenant found in the subdivision's dedicatory instrument. *See* Tex. Prop. Code Ann. § 202.001(1), (4). The case was tried to the court, which found that the Committee was not a property owners' association ("POA") and that

1

the challenged restriction was enforceable. The trial court granted the Committee the declaratory judgment and injunction it sought, and entered judgment in the Committee's favor requiring the Watsons to "remove the violating fence within 45 days of the execution of" the July 11, 2024 judgment. The trial court further ordered the Watsons to pay attorney's fees and litigation expenses of $17,677.67, plus interest and conditional fees in the event of appeal to either this Court or the Texas Supreme Court. This appeal followed.

In a single issue, with four subparts, the Watsons contend that the trial court erred in failing to apply section 202.023 of the Property Code to the Watsons' fence. Because section 202.023 of the Property Code applies in this case and allows a home owner to install a perimeter fence, we reverse the trial court's judgment and remand this case to the trial court. *See id.* § 202.023(b).

## BACKGROUND

Before the Watsons purchased a home in the Davis-Woods Subdivision, in May 2021, the seller told the Watsons that they, the sellers, were not aware of any homeowners' associations, maintenance fees, or assessments. After buying the property, the Watsons constructed a new fence, which enclosed the side yard and met the house at or near its front corner. The prior fence, in contrast, did not enclose the side yard and met the house at or near its rear corner. When the Committee and the Watsons could not agree on the acceptable fence placement, the Committee sued

2

the Watsons, alleging that the Watsons "failed to maintain [their] property to the standards of the community." The Committee sought a declaratory judgment, an injunction, and attorney's fees. The Watsons asserted multiple defenses and affirmative defenses, including the Committee's violation of section 202.023 of the Texas Property Code, which dictates that a POA may not prohibit a homeowner from installing a perimeter fence. The Watsons, like the Committee, sought a declaratory judgment, an injunction, court costs, and attorney's fees.

We summarize the pertinent evidence below.

<u>The Parties' Stipulations</u>

The parties stipulated to the following matters and narrowed the disputed issues:

**I.**

**STIPULATIONS**

The Parties hereby agree and stipulate to the following facts:

1. On or about December 14, 1987, Davis Woods, Inc. filed a certified plat for the creation of the Davis Wood Subdivision (the **"Subdivision"**).

2. The certified plat was recorded at Vol. 10, Page 45 of the Plat Records of Polk County, Texas, a copy of which is attached hereto and incorporated by reference herein as **Exhibit "1"**[.]

3. On or about December 14, 1987, the Developer, Davis Woods, Inc., filed Restrictive Covenants, Reservations and Provisions for Assessments of Davis Woods Subdivision which were recorded at Vol. 644, Page 631, Instrument 146245 of the Official Public

3

Records of Polk County, Texas, (the **"Restrictive Covenants"**) a copy of which is attached hereto and incorporated by reference herein as **Exhibit "2"**.

4. The Restrictive Covenants specifically provide the following, as depicted in the image below:

<u>OTHER PROVISIONS</u>

(1) All restrictions, reservations and covenants shall be binding upon the purchaser of any lot or lots in the subdivision, as well as the successors, heirs and assigns of any such purchaser, developer or any of its successors or assigns, or any purchaser or the successors, heirs and assigns of the purchaser, shall violate or attempt to violate any of the covenants herein, it shall be lawful for the Architectural Committee, or any other person, or persons, or entity owning any lot or lots situated in said subdivision, to prosecute any proceeding at law or in equity, against the person or persons violating or attempting to violate any such covenant and either to prevent, enjoin or restrain him or them from so doing, or to recover damages or other dues for such violation.

See Exhibit 2, pg. 6.

5. The Restrictive Covenants also prescribes the Following as to construction of fences in the Subdivision, depicted in the image below (hereafter, the **"Fence Restriction"**):

(28) No fence may be erected nearer to the front property line than the rear of the dwelling house. Any such fence shall not exceed sixty inches (60") in height and must be approved by the Architectural Committee. The term "fence", as used herein, shall not be construed to be a patio wind screen, or a growing hedge trimmed to forty-eight inches (48") or less in height.

See Exhibit 2, pg. 5.

4

6. On or about May 20, 2021, the Watsons purchased real property consisting of land and improvements located in the Subdivision and commonly known as [street address], Livingston, Texas 77351 (the **"Property"**) pursuant to the deed recorded in Volume 2338, Page 459 of the Official Public Records of the Polk County Clerk, a copy of which is attached hereto as **Exhibit "3"**.

7. At the time of said purchase, the Property comprised both land and improvements which included a single-family residence with an existing fence (**"Original Fence"**) as depicted in the image below and attached hereto as **Exhibit "4"**.



See Exhibit 4.

8. After purchasing the property, the Watsons constructed a new fence (**"New Fence"**) extending the existing border created by the Original Fence between the Property and the adjacent parcel to the east, as depicted in the image above. See Exhibit 4 and Exhibit 1.

9. As constructed, New Fence does not comply with the Fence Restriction only in so far as it was erected nearer to the front property line than the rear of the dwelling house.

10. Except as to its specific location, the Committee seeks no other remedy related to the fence and makes no other allegation that construction of the New Fence violates or fails to comply with the Fence Restriction (e.g., the fence height, fence material, construction without Committee approval, etc.) or in any other requirement set forth in the Restrictive Covenants and seeks no other remedy regarding the Watsons' construction of the New Fence other then (sic) in connection with the disputed issues identified in Article II herein.

11. Defendant Lacey Watson is a U.S. veteran and since 2015, has been determined 100% total and permanent disability by the U.S. Department of Veterans Affairs and Social Security Administration pursuant to which, she receives benefits and services to assist with activities of daily living. *See* Confidential Records from Social Security Administration and the U.S. Department of Veteran Affairs, attached hereto and incorporated by reference as **Exhibit "5"**.

12. Since 2019, Lacey Watson's primary care provider has prescribed the use of a service dog to assist with her physical mobility and emotional and mental health; and since that time, Mrs. Watson has utilized the assistance of a service dog in-training in accordance with her treatment plan.

13. The Watsons contend that because the enclosure created by the Original Fence includes an existing pool, the Watsons constructed the New Fence in part, to create an adjacent enclosure to provide added security for the Watsons' pool, A/C and water controls as well as to provide for a safe and secure area for training of Mrs. Watson's service dog.

14. Thereafter, the Committee, which is comprised of multiple, individual homeowners in the Davis Woods Subdivision and identified in the attached **Exhibit "6"**, retained legal counsel to send a letter to the Watsons dated January 26, 2022 **("Notice")** advising that such newly constructed fence violated the terms of the Restrictive Covenants and demanding immediate removal of the same. A copy of the Notice is attached hereto and incorporated by reference as **Exhibit "7"**.

15. On May 3, 2022, the Watsons, through legal counsel, sent a letter in response to the Committee's Notice (Watsons' **"Response"**), a copy of which is attached hereto and incorporated by reference as **Exhibit "8"**.

16. The Committee does not object to the Watsons' existence of a fence but contends the location of the New Fence violates the Fence Restriction.

17. The Committee eventually filed the present suit alleging claims for breach of the Restrictive Covenants and seek declaratory judgment, injunctive relief, damages, attorney fees and court costs.

18. The Watsons have filed various affirmative defenses and counterclaims as to the Fence Restriction including that Committee's enforcement of the same as against the Watsons' Property is prohibited by or in violation of § 202.023 of the TEXAS PROPERTY CODE and the U.S. Fair Housing Act and Texas Fair Housing Act and for which, the Watsons seek declaratory judgment, injunctive relief, damages, attorney fees and court costs.

19. The Committee denies the counterclaims and affirmative defenses of the Watsons.

8

## II.

## ISSUES IN DISPUTE

The Parties hereby agree and stipulate that the following issues are in dispute requiring a determination by the trier of fact:

A. Whether Texas Property Code § 202.023 limits or prohibits the Committee, property owners association, or owner of property within the Subdivision from adopting or enforcing the Fence Restriction against the Watsons as to the New Fence.

B. Whether the U.S. Fair Housing Act and Texas Fair Housing Act limits or prohibits the Committee, property owners association, or owner of property within the Subdivision from enforcing the Fence Restriction against the Watsons as to the New Fence.

C. Whether the Committee is entitled to declaratory judgment, injunction and attorney's fees and costs against the Watsons.

D. Whether the Watsons are entitled to declaratory judgment, injunction and attorney's fees and costs against the Committee, individual members of the Committee and any owners of property in the Subdivision on whose behalf, this Lawsuit was filed.

The document recites that the stipulations were made pursuant to Rule 11 of the Texas Rules of Civil Procedure, was signed by counsel for both the Watsons and the Committee and was filed with the court.

Steven Paul Watson's Testimony

Paul testified that he and his wife, Lacey, were living in Colorado in the spring of 2021, when they decided to move to Texas. They looked at several properties and chose the Davis-Woods house after visiting it. The Watsons chose the house partly

9

because of the flat area on the side of the house, which would be a good place to train Maizee, Lacey's service dog. The back yard, in contrast, "has a mound that comes up." According to Paul, the flat ground was a safety issue for both the disabled person and the dog. The Watsons also chose the house "because most of everything was on the ground floor of this house[,]" and because there was a pool, features which were important due to Lacey's mobility issues. They also considered it important that there was no homeowners association. Paul stated, "[i]f I would've known there was a deed restriction or restriction of any kind on this property, we would've never bought this house." After Paul testified that he did not understand the import of deed restrictions in the absence of a homeowners association, the trial court stated, "I'll make a finding that there were deed restrictions on this property and he's bound by them."

After buying the house, the Watsons did not remove the previous fence but included it within their new fence, which they extended along the property line before joining it at an angle to the front corner of the house. They did so to fence an area to train the dog and also because they were concerned about theft of air conditioning units, which the Watsons had just replaced at a cost of $24,000. Before building the fence, Paul spoke with his neighbors to apologize for the noise it would make. These contacts included his next-door neighbor Sutton, who helped Paul locate the property line. After fence construction began, Laurie Ann Scott told Paul

10

that she was "the representative of the HOA" and that she would provide him a copy of the deed restriction. Scott provided that documentation about three days later, as did William Avery, a neighbor of the Watsons, and Paul sent his realtor a copy of it. The realtor, in Tyler, told him that "if there was a deed restriction, [she was not] told about it, and that's the title company's hit[.]" These events took place in late June 2021.

Lacey Marie Watson's Testimony

Lacey testified that she was a retired staff sergeant. She had her service dog, a German shepherd, for her PTSD and mobility issues, and she testified that she had the dog since 2019. When the Watsons moved to the property in 2021, Maizee's training had been interrupted by the COVID pandemic and therefore was not complete. According to Lacey, "it can take up to two years or more in order to be able to get a service dog[,]" so Lacey decided to train Maizee herself. Lacey explained that she needed a flat fenced area to train, and that she could not use the "very hilly[]" back yard or the unfenced front yard in case Maizee decided to misbehave. Lacey further explained that having a fence on that side of the house helped her feel safe, since that wall has no windows to enable her to "see what's going on over there." In addition, Lacey confirmed Paul's testimony about wanting to secure the "very expensive AC condensers that we've recently replaced[.]" Lacey testified that if she had known of the deed restrictions or that Scott and others

11

correctly represented their power to veto the Watsons' fence extension, she would have discussed the proposed location with her neighbors because that would be "the courteous thing to do."

Sally Ann McClain's Testimony

Sally Ann McClain ("McClain") testified that although she lived in the Davis-Woods Subdivision for about four years, her mother, Anita Knouse, and her grandmother built some of the first houses in the subdivision about thirty-five years earlier. When McClain moved into the subdivision, she knew of the deed restrictions because they were "part of the information that [she] knew when [she] signed for the house." McClain recalled that she "was elected to be one of the members of the Architectural Control Committee at a homeowner's meeting. And the purpose of that committee was to enforce or uphold our deed restrictions and covenants, and we also did beautification." According to McClain, there had been an Architectural Committee "since the beginning of the subdivision." As a member of the Committee, McClain and the other Committee members "reviewed requests from people when they wanted to make an adjustment to their property that fell under the restrictions, and we also considered when people abused them." McClain testified that there were benefits to the restrictions, in that "the subdivision was created to create a very open feeling. And so the property values are based upon the aesthetics and the – just the openness of the lots." McClain stated that property values decrease if the restrictions

12

are not enforced. Specifically, McClain stated that the Watsons' fence devalued her own property because it detracted from the aesthetics of the community, since all the other houses in the subdivision "are opened from the back corner of the houses to the street."

When homeowners do not comply with the restrictions, the Committee initially responds by requesting compliance. In this instance, the then current Committee members, McClain, Scott, and Carol Henry, "walked door to door asking people if they would support our efforts to try to uphold the deed restrictions." McClain testified that according to the deed restrictions, the individual property owners can sue to enforce the deed restrictions, and the Committee can act on behalf of the members, despite there being no homeowners association. In fact, McClain agreed that all the members of the Committee owned homes in the Davis-Woods Subdivision and that the Committee sued the Watsons on behalf of several of the other homeowners.

After learning of the Watsons' fence extension, the Committee met, reviewed the restrictions, and "knew that . . . it was not in compliance." McClain testified that the Watsons stated that they wanted the additional fenced area so that the dog could go out and not be near the pool, but there was space in the back yard for the dog to use.

In the effort to obtain the Watsons' compliance with the restrictions, the Committee sent them a letter but received no response. The Committee then "had to pursue action or [they] were not doing [their] job." McClain described the procedure for asking the Committee for an exception, stating that the requests are supposed to be written, and that there is a formal process for taking requests to the Committee, but neither that process nor the Committee's procedures are set out in the restrictive covenants. McClain then stated that the Committee follows the procedures that the restrictive covenants require.

Although McClain heard about section 202.023 of the Property Code from a family friend, she did not believe that the Watsons' fence was a necessary security precaution because there were no windows on the wall inside the extended fence. As McClain phrased it, "a wooden fence would not give more security than a brick wall."

William Avery's Testimony

William Avery ("Avery") testified that he had lived in the Davis-Woods Subdivision since 2017 but had never served on the Committee. Avery recalled being aware of the restrictive covenants since he purchased a house lot in 2011. In Avery's opinion, it was important to enforce the covenants because doing so "maintain[ed] the value of property much better and makes the things in the

subdivision a lot cleaner, more organized, and it helps you just maintain your – your value of your house and property much easier."

Avery recalled noticing that the Watsons had cleaned vines and brush from the fence, but at the time, he believed that the Watsons were planning to replace their existing fence. Avery later visited the Watsons after the posts were installed but before the fence was completed. At that time, Avery advised the Watsons that the location of the proposed fence violated the covenants, since it was "in front of the back line of the house." The Watsons indicated that they were unaware of the covenants because their realtor had told them that the subdivision had no homeowners' association and also stated that the restrictions would expire in ten years. The Watsons mentioned "putting a dog in" the fence, to which Avery replied that they could put a dog in their back yard and need not violate the restrictions in building the fence. Avery also recalled telling the Watsons that they should speak to the seller, Malcolm Jones, since Jones was a local attorney who would "know to make [deed restrictions] known to whoever was purchasing it." Avery continued, stating, "a seller usually has to make any restrictions known to the purchaser. And you sign a copy of it when you make the transaction." Avery agreed that restrictions would be found in the seller's disclosure or other closing paperwork but testified that the subdivision had no homeowners' association.

Upon returning home after speaking with the Watsons, Avery called Carol Henry, who was a member of the Committee, and told her that the Watsons were building a fence that was forward of the back of their house. Sometime later, Avery received a notice of a property owners' meeting at McClain's home. Avery and about a dozen other property owners attended the meeting, where the Watsons' fence was discussed.

When asked to describe the process for obtaining Committee approval, Avery gave his own example of needing to obtain permission to remove trees on his property to add fill dirt to his lot where he built his house. In that instance, Avery went to Jim Miller's house when Miller was on the Committee, told Miller what he needed, and Miller replied that he would "have to get with the other Committee members and let us decide and we'll let you know." The Committee later sent Avery a letter reminding him that he was required to have a minimum number of trees on his property when the work was completed.

Johnny Sutton's Testimony

Johnny Sutton ("Sutton") testified that he lived in the subdivision since 1989 and that his house was "just to the east of" the Watsons' house. Sutton was aware of the deed restrictions because he was provided a copy of the restrictions when he closed on his property and because he worked for the developer's family. Sutton believed that these restrictions were imposed "to maintain a certain look in the

16

neighborhood . . . to try to keep anything from going adverse and bringing the property values down."

Shortly after the Watsons purchased their property, Paul introduced himself to Sutton and explained that he wanted to extend the existing fence toward the street, whereupon Sutton advised Paul that there were deed restrictions covering the fence location. Paul then replied that he had not seen the restrictions, and Sutton responded that the restrictions were available at the county clerk's office, and Paul could research them at that location.

Since Sutton formerly ran a surveying crew, he was able to help Paul locate the property line for proper fence placement. Sutton recalled his understanding of the purpose of the fence, stating:

> [SUTTON]: As I recall, and I'm a pretty old guy now, but [Paul] mentioned that his wife had trained service dogs or something like that in the military, and they were both about to retire, but she had a dog she was working with, I think – she had a dog that she was training. And for her to train this dog, they needed a separate area different from the rest of the backyard. And this little area, she was going to utilize that to train a dog that she was working with. That's the way I remember it.
>
> [DEFENSE COUNSEL]: And did you know, or were you aware at the time during this conversation, that Mrs. Watson was a disabled vet?
>
> [SUTTON]: No. No, sir. I did not.
>
> [DEFENSE COUNSEL]: Okay. So, in terms of the conversation being about training of a service dog, did you understand that it was a service dog that Mrs. Watson was using?

17

[SUTTON]: I don't know. She – I thought she was doing the training, but I don't know for who or what, who the dog belonged to.

Sutton also recalled hearing that neighborhood residents had discussed the Watsons' fence and whether the fence violated the restrictions. In addition, Sutton remembered being told that "the Committee was taking a look at it[,]" and that the Committee sued the Watsons because "the fence that he reconstructed was in violation of the deed restrictions."

Anita Knouse's Testimony

Anita Knouse ("Knouse") testified that she had lived in the Davis-Woods Subdivision since the subdivision began, in 1989. Knouse acknowledged that she had never met the Watsons but was concerned about the restrictions in the subdivision because she wanted to protect the investment that she and her husband had made in their home. Knouse believed that if the restrictions were not enforced, it would be detrimental to her property, since "the aesthetic feeling around our homes[] would deteriorate," as would her house value.

Gail Colburn's Testimony

Gail Colburn ("Colburn") testified that she built her house in the Davis-Woods Subdivision and moved into it in 1998. Colburn recalled being aware of the restrictions since moving into the subdivision, because her husband had worked for the developer. Colburn testified that these restrictions were "very important[]" to her, since the restrictions meant that the subdivision would be "nicely maintained."

18

Colburn believed that "if deed restrictions [were] not followed, then anything else could happen."

Todd Summy's Testimony

Todd Summy ("Summy") testified that he moved to the Davis-Woods Subdivision about two years earlier. When Summy and his wife were choosing a new home, they sought "a community that we knew would be consistent in the appearances of the home sites." Summy had previously lived in subdivisions where some houses were well kept but others were not, and so he "just wanted someplace that was nice." Summy was attracted to the Davis-Woods Subdivision because of its deed restrictions, of which Summy was aware because a former subdivision resident, Malcolm Jones, was a "very good friend" of Summy's. According to Summy, Jones wrote the restrictions.

Summy also recalled that Jones described to him the following procedure for working with the Committee. When Summy wanted to build a fence after buying his home, he "called the Architectural Committee, had them come over and take a look at it, and they did." Summy showed the Committee his drawing of his proposed fence as well as its proposed location, and the Committee told him "you're good to go." When Summy completed his fence, the Committee approved it. Summy could not address the procedure Avery described, because he was not present when Avery's request to the Committee took place.

19

Summy also recalled an instance when a property owner built his fence "six [or] seven inches too tall[,]" and the Committee told the owner that he would need to reduce the fence height to comply with the restrictions. At that time, Summy was a member of the Committee, and told the property owner:

> if you read all the rules, you would've known it says to ask us to come take a look with you so that we can go over it, and go over your project, and you're supposed to submit one, a drawing to the Architectural Committee, and then we approve it in writing, we sign it, and we give it back to you and you build it. When you're done, you call us, we come back and inspect it, make sure it was built as planned.

Documentary Evidence

The record contains the following exhibits:

Plaintiff's Exhibits:

1. Plat of Subdivision
2. 1987 Restrictive Covenant
3. through 9. Deeds and Affidavit
10. Title Policy
11. Photographs
12. Letter to the Watsons from the Architectural Committee
13. Letter to Watsons from Plaintiff's Attorney
14. Plaintiff's Counsel's Attorney's Fees

Defendants' Exhibits:

1. December 14, 1987 Plat for the Davis-Woods Subdivision
2. December 14, 1987 Restrictive Covenants of the Davis-Woods Subdivision
3. May 20, 2021 General Warranty Deed Conveying Property to Watsons
4. Photograph Showing Old and New Fence Lines
5. Disability Documentation Regarding Lacey Watson
6. List of Committee Members and Represented Property Owners

20

7. January 26, 2022 Letter from Plaintiff's Counsel to the Watsons
8. The Watsons' Response to Plaintiff's Counsel
9. Plaintiff's First Supplemental Initial Disclosure
10. Defendants' Counsel's Attorney's Fees

Trial Court's Findings of Fact and Conclusions of Law

The trial court signed the following applicable Findings of Fact and Conclusions of Law on June 25, 2024.

# FINDINGS OF FACT

1. On or about December 14, 1987, Davis Woods, Inc., (the "Developer"), filed a certified plat for the creation of the Davis-Woods Subdivision (the "Subdivision"). []

2. The certified Plat of the Davis-Woods Subdivision was recorded at Vol. 10, Page 45 of the Plat Records of Polk County, Texas. []

3. On or about December 14, 1987, the Developer, David Woods, Inc., filed "Restrictive Covenants, Reservations and Provisions for Assessments of David-Woods", (the "Restrictive Covenants"), for the Subdivision which were recorded at Vol. 644, Page 631, et seq, Instrument 146245 of the Official Public Records of Polk County, Texas. []

4. The Restrictive Covenants, under "OTHER PROVISIONS", [Vol. 644, page 636, first paragraph], specifically provide the following:

(1) All restrictions, reservations and covenants shall be binding upon the purchaser of any lot or lots in the subdivision, as well as the successors, heirs and assigns of any such purchaser. If developer or any of its successors or assigns, or any purchaser or the successors, heirs and assigns of the purchase, shall violate or attempt to violate any of the covenants herein, it shall be lawful for the Architectural Committee, or any other persons, or persons, or entity owning any lot or lots situated in said

21

subdivision, to prosecute any proceeding at law or in equity, against the person or persons violating or attempting to violate any such covenant and either to prevent, enjoin or restrain him or them from so doing, or to recover damages or other dues for such violation. []

5. The Restrictive Covenants, under "OTHER PROVISIONS", [Vol. 644, Page 635, third paragraph] specifically provide the following:

> (3) In the event that there is any doubt or ambiguity as to the intent, intendement [sic], or meaning of any covenant, assessment, restriction, stipulation or reservation contained herein or any portion hereof, all doubts shall be resolved in favor of upholding the broadest construction of said covenant, assessment, reservation, restriction or stipulation or any portion thereof. []

6. The Restrictive Covenants, under "COMMITTEE", [Vol. 644, pages 635-636, fourth paragraph] provides for the creation of the "DAVIS WOODS SUBDIVISION ARCHITECTURAL COMMITTEE, ("Committee"), which Committee shall initially be composed of not less than three (3) persons." This section of the Restrictive Covenants provides for the initial three (3) committee members and their successors. The Restrictive Covenants further provides:

There is hereby created the DAVIS WOODS SUBDIVISION ARCHITECTURAL COMMITTEE, which Committee shall initially be composed of not less than three (3) persons.

The Committee shall be composed initially of the developer and two (2) additional members to be appointed by the developer and said developer shall have the sole exclusive authority each year to appoint new or additional members of the committee as it deems necessary until all of the lots in said subdivision are sold. Within ninety (90) days after the developer has sold all of the lots in said subdivision, or sooner if the developer so desires, the committee shall call a meeting of all lot owners to elect a new Architectural Committee, which new committee shall be composed of elected lot owners, and similar elections shall be held each year thereafter. A vacancy on the committee, resulting from the death or resignation

22

of any member of the committee or from the refusal or inability of any member to serve, may be filled by appointment by the developer, or any successor of the developer, or by any person or entitled designated for such purposes by the developer.

Written notice of each meeting called to elect a new committee after the sale of all lots within the subdivision, or sooner if the developer so elects, shall be mailed to each lot owner at the last known address of such lot owner according to the records of the Architectural Committee at least ten (10) days before the date of the meeting. At each election, the owner, or owners, of each lot shall be entitled to one vote. Votes may be cast in person or by the holders of property properly executed proxies. The owner, or owners, of more than one lot shall only be entitled to only one vote.

The committee shall function as representatives of all of the property owners in the subdivision, and shall be authorized to enforce by any appropriate proceedings the foregoing restrictions; enforce or release any lien imposed on any lot by reason of a violation of any of the foregoing restrictions; and approve or reject plans and specifications for buildings to be erected in said subdivision; and approve or reject any reasonable request of lot owners. []

7. The Restrictive Covenants, Restriction (2), [Vol. 644, page 632], prescribes, in relevant part, the following as to enforcement of the Restrictive Covenants:

   (2) If any lot owner . . . should violate, or attempt to violate, any of the covenants herein . . . any . . . persons owning any real property situated in said subdivision, shall have the right to prosecute by any proceeding at law or equity against the person or persons violating or attempting to violate such restrictions, and either to prevent it, him, her or them from doing, or to recover damages for, such violation. In such event of any violation, or threat of violation of any of the covenants herein . . . any owner of any lot in the subdivision may bring action at law or in equity, either for injunction, action for damages or such other remedy as may be available. In the event that . . . any lot owner recovers judgment against any person for violation or threat of violation of any of the covenants herein, the developer or any lot owner shall be entitled to recover from

such person reasonable attorneys fees. The failure of any lot owner . . . to enforce any restrictions, conditions, covenants or agreement herein shall in no event be deemed a waiver of the right to do so thereafter as to the same breach or as to one occurring prior or subsequent thereto, not shall such failure give rise to any claim or cause of action against the developer or such lot owner. []

8. The Restrictive Covenants, Restriction (28), [Vol. 644, page 635], prescribes the following as to construction of fences in the Subdivision (hereafter, the "Fence Restriction"):

(28) No fence may be erected nearer to the front property line than the rear of the dwelling house. Any such fence shall not exceed sixty (60") in height and **must be approved by the Architectural Committee**. The term "fence", as used herein, shall not be construed to be a patio wind screen, or a growing hedge trimmed to forty-eight (48") or less in height. [] **(Emphasis added)**.

9. The Restrictive Covenants do not create mandatory assessments nor mandatory membership in the Committee.

10. On February 29, 1997, Davis Woods, Inc., the Developer, conveyed to Robert M. Snowberger and wife, Cori B. Snowberger, Lot 12, Block 2 (the "Property") in the Davis Woods Subdivision, by General Warranty Deed filed March 3, 1997 at Vol. 97-1045-337, et seq., in the Official Records of Pol County, Texas. The deed made specific reference to the existence of deed restrictions: "This conveyance is made and accepted expressly subject to (1) the restrictive covenants for the Davis Woods Subdivision, as recorded at Volume 644. Page 631 et seq of the Official Records of Polk County, Texas . . .". []

. . . .

14. On June 13, 2007, ADCO International, Inc., sold to R. Malcolm Jones, the Property in the Davis Woods Subdivision, by Special Warranty Deed with Vendor's Lien Retained, filed June 14, 2007, at Vol. 2007-1584-674, et seq., in the Official Records of Polk County, Texas. The deed made specific reference to the existence of deed restrictions under "Reservations from and Exceptions to

24

Conveyance and Warranty: Exceptions: . . . (3) All presently recorded restrictive covenants . . .". []

15. On July 31, 2009, R. Malcolm Jones, conveyed to R. Malcolm Jones, as Trustee of the R. Malcolm Jones Living Trust. The Poperty [sic] in the Davis Wroods [sic] Subdivision, by General Warranty Deed, filed August 18, 2009, at Vol. 2009-1712-159, et seq., in the Official Records of Polk County, Texas. The deed made specific reference to the existence of deed restrictions under "Reservations from and Exceptions to Conveyance and Warranty: Exceptions: . . . (3) All presently recorded restrictive covenants . . .". []

16. On May 20, 2021, R. Malcolm Jones, Individually joined pro forma by his wife, Rebekah F. Flores Jones, and R. Malcolm Jones, as sole Trustee of the R. Malcolm Jones Living Trust conveyed to Steven Paul Watson and wife Lacey Marie Watson, (the "Watsons" and/or "Defendants"), the Property, in the Davis Woods Subdivision, by General Warranty Deed with Vendor's Lien Retained, filed May 21, 2021, at Vol. 2021-2338-459, et seq., in the Official Records of Polk County, Texas. The deed made specific reference to the existence of deed restrictions under "Reservations from and Exceptions to Conveyance and Warranty: Exceptions: . . . validly existing restrictive covenants common to the platted subdivision in which the Property is located . . .". []

17. The Property purchased by the Watson on May 20, 2021, consists of land and improvements located in the Subdivision and commonly known as [street address], Livingston, Texas 77351. []

18. In conjunction with the purchase of the Property, the Watsons obtained a Title Policy through Polk County Abstract and First American Title Guaranty Company. The Title Policy specifically referenced the existence of the deed restrictions under Schedule B, "Exceptions", paragraph I., which provides, in part "Restrictions covenants, reservations, easements, liens, charges and fees, as set out in instrument recorded in Volume 644, Page 631, et seq., Official Records, Polk County, Texas . . .". []

19. At the time of said purchase, the Property comprised both land and improvements which included a single-family residence with an existing fence ("Original Fence"). []

25

20. The Original Fence had been approved by the Subdivision Architectural Committee as being compliant with the restrictive Covenants.

21. After purchasing the Property, in early June 2021, the Defendants began construction on an extension of the fence, extending the existing border of the Original Fence from the rear of the dwelling house to an area closer to the front property line ("New Fence"). []

22. Prior to the start of the construction of the New Fence, the Defendants did not request approval from the Architectural Committee for the change in the fence line.

23. Defendants were verbally notified by representatives of the Architectural Committee and other property owners prior to completion of the New Fence that the New Fence failed to comply with the Restrictive Covenants.

24. Defendants did not comply with the Restrictive Covenant, specifically Restrictive Covenant (28), in that Defendants did not seek approval for the construction of the New Fence, from the Committee.

25. Defendants proceeded to complete the New Fence despite actual and constructive knowledge of the Restrictive Covenants and actual notice of the violation of the Restrictive Covenants.

26. The New Fence was completed in June 2021.

27. As constructed, New Fence does not comply with the Fence Restriction, Restrictive Covenant (28), only in so far as it was erected nearer to the front property line than the rear of the dwelling house.

28. On or about October 28, 2021, the Plaintiff provided a written notice to the Defendants:

Dear Mr. and Mrs. Watson:

The Responsibility of the Davis Woods architectural committee is to uphold and enforce the items listed in the Restrictive Covenants, Reservations, and Provisions for Assessments of Davis Woods. The fence that has recently been erected on your property is in

26

violation of Reservation 28 of the Davis Woods restrictive covenants on file at Polk County Court House. As such, the fence in question must be relocated to comply with restrictions within 30 days of receipt of this letter.

It is our sincere hope that this situation can be amicably resolved by the relocation of your fence to both meet your needs and comply with our Davis Woods requirements.

Sincerely,
Carol Henry, Ann McClain, Laurie Anne Scott
Davis Woods architectural committee []

29. Thereafter, the Committee, which is a three member Committee elected by the property owners in the Davis Woods Subdivision (the property owners are identified in the attached Exhibit "6"), retained legal counsel to send a letter to the Watsons dated January 26, 2022 ("Notice") advising that such newly constructed fence violated the terms of the Restrictive Covenants and demanding immediate removal of the same. []

30. On May 3, 2022, the Watsons, through legal counsel, sent a letter in response to the Committee's Notice (Watsons' "Response"). []

31. Defendants failed and refused to correct the violation of Restrictive Covenant (28).

32. Except as to its specific location, the Committee seeks no other remedy related to the fence and makes no other allegation that construction of the New Fence violates or fails to comply with the Fence Restriction (e.g., the fence height, fence material, construction without Committee approval, etc.) or in any other requirement set forth in the Restrictive Covenants and seeks no other remedy regarding the Watsons' construction of the New Fence other than in connection with the disputed issues identified in Article II herein. []

33. On May 3, 2022, the Watsons, through legal counsel, sent a letter in response to the Committee's Notice (Watsons' "Response"). []

27

34. The Watsons contend that because the enclosure created by the Original Fence includes an existing pool, the Watsons constructed the New Fence in part, to create an adjacent enclosure to provide added security for the Watsons' pool, A/C and water controls as well as to provide for a safe and secure area for training of Mrs. Watson's service dog. []

35. There was no evidence presented of any necessity for "added security for the Watsons' pool, A/C and water controls" showing that the Davis Woods subdivision was a high crime area where A/Cs were being vandalized or otherwise having the copper in them stolen.

36. The Committee does not object to the Watsons' existence of a fence but contends the location of the New Fence violates the Fence Restriction. []

37. The Committee eventually filed the present suit alleging claims for breach of the Restrictive Covenants and seek declaratory judgment, injunctive relief, damages, attorney fees and court costs. []

38. On August 30, 2022, the Committee filed its "Plaintiff's Original Petition" in the 258th District Court of Polk County, Texas, in the above entitled and numbered lawsuit. The lawsuit sought enforcement of the Fence Restriction, and sought injunctive relief and attorney's fees for prosecuting the lawsuit.

39. On October 10, 2022 the Defendants filed their "Defendants' Original Answer, Counterclaims and Affirmative Defenses" which set forth a general denial, and numerous affirmative defenses:

> **AFFIRMATIVE DEFENSES** [AS PLEADED BY DEFENDANT]
>
> 2. Defendants assert that Plaintiff does not have the capacity to bring this suit. Plaintiff has made no showing that it is a "person" as required by law to file legal actions such as this.
>
> 3. Defendants assert that the alleged restrictions Plaintiff seeks to enforce have been abandoned and/or waived.

28

4. Plaintiff does not have standing to bring this suit. There is no property owners' association or architectural committee in existence. There is no evidence that such committee was ever created by the now defunct developer, but if it was, it has not continued as an association during the intervening 35 years. No notice of a validly constituted Architectural Committee and no notice of elections or successor appointees or members have been filed in the County records; likewise, no assumed name applications or other such documents indicating that such a committee or organization exists have yet been filed. Any such "committee" or association has long since been abandoned, never existed or otherwise ceased to exist. Accordingly, any legal actions purportedly commenced by such committee are invalid and unauthorized.

5. Defendants assert that Plaintiff is barred by statute from enforcing the particular restriction at issue in this matter. Specifically Plaintiff seeks to enforce the following restriction: "28. No fences may be erected nearer to the front property line than the rear of the dwelling house". *See Plaintiff's Petition Section IV. Page 3*. Plaintiff, through its attorney, has therefore demanded that Defendants "remove the fence where it violates these covenants." There are no objections to the materials of fence, only the placement. However, the Property Code prohibits enforcement of this restriction:

6. Defendants' fence encloses their back yard. Plaintiff wants to prohibit fencing or enclosure of the side of the house, where air conditioning units and pool equipment are located. No objections to materials have been made.

7. Defendants assert that Plaintiff's claims are barred in whole or in part, due to impossibility of compliance with prior approval. Specifically, Defendants were affirmatively advised by the subject property's previous owner there was no existing homeowner's association. Defendants were not notified of an existing Property Owners Association or Architectural Committee. No public records or filings exist to identify such organization or committee. Lack of proper notice of such organization rendered it impossible for Defendants to seek any

29

sort of approval from the unknown (most probably non-existent) "architectural committee." The first and only notice was from Plaintiff's counsel, who refused to identify the committee, provide rules, by laws, rule or regulations. To this day Plaintiffs have not provided Defendants written notice identifying the names and contact information for the committee members or the governing rules or procedures specifying how Defendants can request or seek approval.

8. In addition to and/or alternatively, without waiving the foregoing, Defendants plead that Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to mitigate its damages, if any.

9. In addition to and/or alternatively, without waiving the foregoing, Defendants plead that Plaintiff's claims are barred in whole or in part, because Plaintiff proximately caused its own damages, if any.

10. In addition to and/or alternatively, without waiving the foregoing, Defendants plead that Plaintiff's claims are barred, in whole or in part, because any damages suffered by Plaintiff were caused by the acts and omissions of a party or parties over whom Defendant did not exercise control or right of control.

11. In addition to and/or alternatively, without waiving the foregoing, Defendants plead that Defendant is not liable because Defendants were never provided notice of an existing homeowner's association.

40. The Watsons have filed various affirmative defenses and counterclaims as to the Fence Restriction including that Committee's enforcement of the same as against the Watsons' Property is prohibited by or in violation of § 202.023 of the TEXAS PROPERTY CODE and the U.S. Fair Housing Act and Texas Fair Housing Act and for which, the Watsons sought declaratory judgment, injunctive relief, damages, attorney fees and court costs. []

41. The Committee denies the counterclaims and affirmative defenses of the Watsons. []

30

42. The Court has jurisdiction over the parties and the subject matter of this lawsuit.

43. Venue in Polk County is proper under Section 15.011 of the Texas Civil Practices and Remedies Code. []

44. The Defendants' affirmative defenses have not been proved

45. Defendants' Affirmative Defense ¶2 fails: The Plaintiff has the capacity to bring this suit. []

46. Defendants' Affirmative Defense ¶3 fails: The Restrictive Covenants Plaintiff seeks to enforce have not been abandoned and/or waived.

47. Defendant's Affirmative Defense ¶4 fails,: Plaintiff has standing to bring this suit. The Committee in not a property owners' association but is an architectural committee that is in existence pursuant to the Restrictive Covenants. Neither the Restrictive Covenants nor the Committee have been abandoned. This [sic] legal actions commenced by such Committee are valid and authorized. []

48. Defendants' Affirmative Defense ¶5 fails: Plaintiff is not barred by statute from enforcing the particular restriction at issue in this matter. Section 202.023, Texas Property Code, only applies to a "property owners association" and Plaintiff is not a property owners association.

49. Defendants' Affirmative Defense ¶6 fails: Defendants' fence does not enclose their "back yard". The New Fence encloses the side yard of Defendants; the Original Fence enclosed the back yard – the New Fence enclosed the side yard.

50. Defendants' Affirmative Defense ¶7 fails: (a) Defendants' argument that "Plaintiff's claims are barred in whole or in part, due to impossibility of compliance with prior approval" in that Defendants had constructive notice of the Restrictive Covenants and were contacted by neighbors when they started construction of the New Fence but took no action to seek approval of the New Fence and its location, and instead proceeded on with the construction on the New Fence. (b) The Plaintiff is not a property owners association under Chapter 209 of the Texas Property Code, and thus were not required to file any Management Certificate; (c) The allegation the "first and only notice was from Plaintiff's counsel" was not supported by the evidence,

31

as Defendants received a written notice from the Committee on October 28, 2021, Plaintiff's Exhibit 12. []

51. Defendants' Affirmative Defense ¶8 fails: Plaintiff's claims are not "barred, in whole or in part, because Plaintiff has failed to mitigate its damages, if any" is not supported by credible evidence. Defendants refused to comply with the Notice about its violation of the Restrictive Covenants resulting in the filing and prosecution of this lawsuit.

52. Defendants' Affirmative Defense ¶9 fails: Plaintiff's claims are not "barred, in whole or in part, because Plaintiff proximately caused its own damages, if any" is not supported by credible evidence. Defendants' action required the action by the Committee to enforce the Restrictive Covenants.

53. Defendants' Affirmative Defense ¶10 failes [sic]: Plaintiff's claims are not "barred, in whole or in part, because any damages suffered by Plaintiff were caused by the acts and omissions of a party or parties over whom Defendant did not exercise control or right of control" is not supported by credible evidence. Any "damages" suffered by Defendants were the result of their own actions and failure to comply with the Restrictive Covenants.

54. Defendants' Affirmative Defense ¶11 fails: Defendants' affirmative defense that "Defendant is not liable because Defendants were never provided notice of an existing homeowner's association" fails because the Plaintiff is not a homeowner's association and thus was not required to provide notice. Defendants were given constructive notice by the filed Restrictive Covenants and actual knowledge of their violations by their neighbor when they started their New Fence.

55. The Defendants violated Restrictive Covenant (28), the Fence Restriction, by their actions, and despite verbal notice of the violation, and two written notices, failed to correct the violation of Restrictive Covenant (28), resulting in the filing of this lawsuit.

56. There was no attempt at mediation, and no depositions were taken in this lawsuit by the parties nor their attorneys.

57. The Plaintiff's attorney, [name of Plaintiff's counsel], filed an Affidavit of Attorney's Fees, seeking the Committee's attorneys fees for prosecuting the deed restriction violation through the trial, of

$14,532.75 plus $1,500.00 for trial, expenses of $1,644.92, plus $5,000.00 if the matter is appealed to the Court of Appeals and an additional $5,000.00 if the case is appealed to the Texas Supreme Court.

58. [Plaintiff's counsel] was licensed to practice law in Texas on May 11, 1984, and had practice law thirty-nine (39) years at the time of trial.

59. The Court finds that the attorney's fees claimed by Plaintiff's attorney are reasonable and necessary in the Polk County, Texas area.

60. The Defendants' attorney filed a "Declaration of [Defense counsel] seeking attorney fees of $53,079.89 plus court costs of $294.99, plus $5,850.00 in legal services through entry of judgment, plus $30,000.00 if the case is appeal to the Court of Appeals and $35,000.00 if the case is appealed to the Texas Supreme Court. []

61. [Defense counsel] was licensed to practice law in Texas on December 10, 2009, and has practice law fourteen (14) years at the time of trial.

62. The Court finds that, if Defendants were entitled to attorney's fees, the attorney's fees claimed by Defendants' attorney are excessive and are not reasonable and necessary in the Polk County, Texas area.

63. A reasonable hourly rate for attorney's fees in the Polk County area is between $250.00 and $350.00 an hour, depending on the experience of the attorney.

64. A reasonable and necessary amount of time to investigate, prepare for a bench trial, and conduct a bench trial in a lawsuit of this nature would be between 60 to 80 hours.

65. A reasonable and necessary attorney's fee for an appeal to the Texas Court of Appeals would be $10,000.00.

66. A reasonable and necessary attorney's fee for arguing a case before the Texas Court of Appeals would be $5,000.00.

67. A reasonable and necessary attorney's fee for filing an application for writ to the Texas Supreme Court would be $5,000.00.

68. A reasonable and necessary attorney's fee for briefing before the Texas supreme Court would be $10,000.00.

33

69. A reasonable and necessary attorney's fee for arguing a case before the Texas Supreme Court would be $5,000.00.

70. The Plaintiff is not a property owners association as defined by Chapter 209 of the Texas Property Code.

71. The Plaintiff is not a property owners association as defined by Chapter 202 of the Texas Property Code.

. . . .

## CONCLUSIONS OF LAW ON PLAINTIFF'S LAWSUIT

100. The Plat of the Davis Woods Subdivision . . . was properly recorded in the appropriate official records of Polk County, Texas.

101. The Restrictive Covenants . . . were properly recorded in the appropriate official records of Polk County, Texas.

102. Pursuant to Texas Property Code § 13.002 Defendants had constructive notice of the existence of the Subdivision Plat and Restrictive Covenants:

Sec. 13.002. EFFECT OF RECORDED INSTRUMENT. An instrument that is properly recorded in the proper county is: (1) notice to all persons of the existence of the instrument; and (2) subject to inspection by the public.

103. Pursuant to the language in the respective deeds, . . . and the Title Policy . . . the Defendants had actual notice of the existence of the Restrictive Covenants.

104. The location of the border of the New Fence violates the terms of Restrictive Covenant (28) where it is currently located. []

105. Restrictive Covenant (28) does not prevent the installation of a perimeter fence, provided that the front of the perimeter fence is not in front of the back corner of the residence.

106. Restrictive Covenant (28) regulates the manner, method and location of a fence in the Davis Woods Subdivision in Polk County, Texas..

107. Texas Property Code §202.003(a) entitled "Construction of Restrictive Covenants" provides that "(a) A restrictive covenant shall

34

be liberally construed to give effect to its purposes and intent." In a case out of San Jacinto County, Texas, *Benard v. Humble*, 990 S.W.2d 929, 930 (Tex. App.—Beaumont 1999, pet. denied), the Court of Appeals wrote:

> It is the duty of this Court, as it was the duty of the trial court, to review the wording of the restrictive language and determine therefrom, the intent of the drafter. *See Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex.1987). Most importantly however, in our effort to determine such intent, we must give liberal construction to the covenant's language, seeking to insure that its provisions are given effect. TEX. PROP. CODE ANN. § 202.003(a). (Vernon 1995); *see Crispin v. Paragon Homes, Inc.* 888 S.W.2d 78, 81 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Though statutorily we are to liberally construe the questioned language, liberality must be toned to the given facts. For example, our Texas Supreme Court has stated: "Restrictive clauses in instruments concerning real estate must be construed strictly, favoring the grantee and against the grantor, and all doubt should be resolved in favor of the free and unrestrictive use of the premises." *Davis v. Huey*, 620 S.W.2d 561, 565 (Tex. 1981). Words used in restrictions and the restriction as a whole may not be enlarged, extended, stretched, or changed by construction; rather, the words must be given their commonly accepted meaning at the time the covenant was written. *Wilmoth*, 734 S.W.2d at 657-58. Further, should there exist ambiguity or doubt as to intent or meaning, the covenant is to be strictly construed against the party seeking to enforce same, and favorably toward the free and unrestricted use of the premises. *Id.* at 657.

108. *Ridgepoint Rentals, LLC v. McGrath*, No[s. 09-16-00393-CV,] NO. 09-17-00006-CV[, 2017 Tex. App. LEXIS 11384, at **18-19] (Tex. App.—Beaumont [Dec. 7,] 2017, pet. denied) [(mem. op.)] also dealt with construction of restrictive covenants:

> Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 996 S.W.2d 474, 478 (Tex. 1998) (citing *Scoville v. Springpark Homeowner's Ass'n*, 784 S.W.2d 498, 502 (Tex. App.—Dallas 1990, writ denied). An instrument is not ambiguous simply because the parties disagree

over its meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)); Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998) (holding that mere conflicting expectations or disputes are not enough to create ambiguity).

Whether a restrictive covenant is ambiguous is a matter of law for the court to decide. *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Truong v. City of Houston*, 99 S.W.3d 204, 214 (Tex. App.—Houston [1st Dist.] 2002, no pet) (citing *Roman Catholic Diocese of Galveston-Houston v. First Colony Cmty. Serv. Ass'n, Inc.*, 881 S.W.2d 161, 163 (Tex. App.—Houston [1st Dist.] 1994, writ denied)). A reviewing court construes an unambiguous instrument as a matter of law. *Dynegy*, 297 S.W.3d at 168 (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

When the language of a restrictive covenant is unambiguous, section 202.003(a) of the Property Code requires that the restrictive Covenant be liberally construed to give effect to its purpose and intent. *Jennings v.* Bindseil, 258 S.W.3d 190, 195 (Tex. App.—Austin 2008, no pet.); see Tex. Prop. Code Ann. 202.003(a) (West 2014).

When terms are not defined, courts determine the parties' intent by giving the terms their "plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res.*, 939 S.W.2d at 121; see also *Truong*, 99 S.W.3d at 214 (citing *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657-58 (Tex. 1987)) ("Words and phrases in the covenant must be given their commonly accepted meaning."); *Travis Heights Improvement Ass'n v. Small*, 662 S.W.2d 406, 409 (Tex. App.—Austin 1983, no writ) (Language in a restrictive covenant "will be given its plain grammatical, ordinary and commonly accepted meaning, unless it appears that to do so will defeat the intention of the parties as clearly evidenced by other provisions of the instrument.").

Whether a restrictive covenant is violated by a particular set of facts is also a question of law, which we review de novo. See *Elbar Invs., Inc. v. Garden Oaks Maint. Org.*, 500 S.W.3d 1, 3-5 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (reviewing do novo whether the facts constituted a violation of a restrictive covenant). As a general rule, covenants restricting the free use of land are not favored by the courts, but will be enforced if they are clearly worded and confined to a lawful purpose. *Wilmoth*, 734 S.W.2d at 657; *Jennings*, 258 S.W.3d at 194-95.

109. Deed Restriction (28) is not ambiguous.

110. [recites section 202.023(a), (b), and (c) of the Texas Property Code]

111. Section 202.023, which became effective on June 15, 2021 when signed by the Texas Governor, (but the bill reflects effective date of September 1, 2021), does not prohibit a restrictive covenant that regulates of the manner, method or location of a fence so long as it does not prohibit or have the effect of prohibiting a fence.

112. Section 202.o23 was not in effect at the time that the Defendants began construction of the New Fence without approval of the Committee.

113. Neither Section 202.023, nor the Texas Property Code, defines what is a "perimeter fence". "Perimeter" is defined by Merriman-Webster: 1a: the boundary of a closed plane figure; b: the length of a perimeter; 2: a line or strip bounding or protecting an area; 3: outer limits – often used in plural; 4: the part of a basketball court outside the three-point line."

114. Defendants' Requested Finding of Fact No. 33 appears to establish that the New Fence in its location is a "perimeter fence" where they state that "[t]he New Fence constructed by the Watsons constitutes a "perimeter fence" as that term is used in" Texas Property Code § 202.023.

115. Cases that reference "perimeter fence" do not provide a specific definition, but merely use the word as descriptive. "Constructing a new perimeter fence around the entire property . . ." *McDuff v. Brumley*, [No. 07-17-00248-CV,] 2022 Tex.App. LEXIS 5658 [(Tex. App.—

Amarillo] Aug. 8, 2022, [pet. denied) (mem. op.)]; "In regard to the second tract, the City asked Wright Realty to "construct . . . a perimeter fence, grading and drainage improvements. . ." *Wright Realty Interests v. City of Friendswood*, 433 S.W.3d 26 (Tex.App.—Houston 2013); ". . . accumulate on the lower portion of the fifty-acre development and at the Pond wall and collects on the perimeter fence of the Williams property and neighbor's yards." *Williams v. Wildwood Dev. Co.*, [No. 10-22-00250-CV,] 2023 Tex. App. LEXIS 1658 [(Tex. App.—Waco] Mar. 15, 2023[, no pet.) (mem. op.)]; "LES entered the pool area through a hole in the perimeter fence surrounding the pool." *Cameron County v. Salinas*, [No. 13-11-00745-CV,] 2012 Tex. App. LEXIS 7421 [(Tex. App.—Corpus Christi-Edinburg] Aug. 27, 2012, [no pet.) (mem.op.)], Collins English Dictionary defines the term as "a fence that serves as a boundary around something." However, most dictionaries separate the words and provide definitions for each. I have not been able to find anything specific that state whether "perimeter" is specific to only the outer limits of the property line or is specific to the particular area to be enclosed.

116. The Supreme Court of Texas set forth the standard for construing a statute in *Marcus Cable Associates, L.P. v. Krohn*, 90 S.W.3d 697, 706 (Tex. 2002):

> Our purpose in construing a statute is to determine the Legislature's intent. . . . As a starting point, we construe statutes as written and, if possible, ascertain intent from the statutory language. . . . We may also consider other factors, including the object the statute seeks to obtain, legislative history, and the consequences of a particular construction. . . . Moreover, we must always consider a statute as a whole and attempt to harmonize its various provisions. . . . We must also, if possible, construe statutes to avoid constitutional infirmities.

117. The Court in *LJA Eng'g Inc. v. Santos*, 652 S.W.3d 916, 919 (Tex. App.—Houston [14th Dist.] 2022, no pet.), provided these factors:

> (1) statutory interpretation presents a question of law subject to de novo review; (2) if the statutory text is clear, the court will give the statute its plain meaning without resorting to rules of construction or extrinsic aids; (3) if a statute is susceptible to more than one reasonable interpretation the court may look

beyond its language for assistance in determining legislative intent; (4) the court presumes that every word of a statute was used for a purpose, and every omitted word was purposefully not chosen; (5) the court will construe the language of the statute according to the rules of grammar and common usage.

118. Section 202.023, Texas Property Code, does not provide a definition of what "perimeter" means. The legislative history for H.B. 3571 includes the following in the section entitled "Background and Purpose":

> Unfortunately, there are reports of some property owners' associations preventing property owners from installing security measures such as fences, motion detectors, and security cameras. C.S.H.B. 3571 seeks to ensure that Texans are able to adequately protect their homes by prohibiting a property owners' association from preventing a property owner from building or installing security measures.

119. [recites the definition of "Property owners' association" set forth in section 202.001(2) of the Property Code]

120. Chapter 202, Texas Property Code, does apply because Chapter 202 applies to all restrictive covenants regardless of the date on which they were created, including condominiums and single family subdivisions. However, the Architecture Committee is not a property owners association because it does not consist primarily of the owners of the property covered by the restrictions. It only consists of a few elected owners which is not a property owners association.

121. [recites the definition of "Property owners' association" found in section 209.002(7) of the Texas Property Code]

122. Chapter 209 does not apply unless the deed restrictions create mandatory assessments (209.003(a)) and mandatory membership in the Association (209.003(b)). Since the Restrictive Covenants do not have mandatory assessments and mandatory membership, then Chapter 209 does not apply.

123. The Davis Woods Subdivision Architectural Committee is not a "property owners association" as defined by Chapters 202 and 209 of the Texas Property Code.

124. Because the Davis Woods Subdivision Architectural Committee is not a "property owners association" then Section 202.023 does not apply to it and the New Fence is in violation of the deed restrictions.

125. The plain and unambiguous language of the restrictive covenant support that Restrictive Covenant (28) is proper and enforceable against the New Fence.

126. The Court concludes that [sic] is no evidence of waiver presented in this trial, and accordingly Defendants' affirmative defense of waiver is rejected. Waiver is an affirmative defense. The Houston Court of Appeals in New Jerusalem Baptist Church, Inc., Appellant v. City of Houston, 598 S.W.2d 666, (Tex.Ct.App.—Houston [14th Dist.] [1980, no writ]), discussed the affirmative defense of waiver:

> In order to establish the affirmative defense of waiver in a deed restriction case, the non-conforming user must prove that the violations then existing are so great as to lead the mind of the "average man" to reasonably conclude that the restriction in question has been abandoned and its enforcement waived. *Garden Oaks Board of Trustees et al. v. Gibbs*, 489 S.W.2d 133 (Tex.Civ.App. Houston (1st Dist.) 1972, writ ref'd n.r.e.). Among the factors to be considered by the "average man" are the number, nature, and severity of the then existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant. *Cowling v. Colligan, supra*.

In the *New Jerusalem* case, the Court of Appeals held that four (4) nonconforming violations in a subdivision with 169 lots did not amount to a waiver of the deed restrictions. The Court of Appeals concluded:

> In the case before us, the evidence indicates that there are currently four non-conforming uses within the 169 lots of Shamrock Manor. There is some evidence of a salvage yard; however, there is conflicting evidence on whether a salvage business is being conducted therein. There is evidence of two beauty shops; however, both are allegedly incidental to the use of the property as residences (and as such should not be considered as evidence of a waiver of the covenant). *Davis v. Hinton*, 374 S.W.2d 723 (Tex.Civ.App. Tyler 1964, writ ref'd n.r.e.). There is evidence of another church within the subdivision a short distance from appellant's lots. There was a

great deal of evidence of prior non-conforming uses; however, these uses should not be considered in determining whether there is a present intent to abandon the restriction, as the applicability of the covenant is renewed once the violation of it ceases. *Schoenhals v. Close*, 451 S.W.2d 597 (Tex. Civ. App. Amarillo 1970, no writ). Moreover, there is evidence of at least one recent enforcement [**8] of the covenant.

Based on the above, we hold there was sufficient evidence for the trial court to conclude that the "average man," when faced with these facts, would reasonably conclude that the restriction in question had not been abandoned nor its enforcement waived.

127. In a case from Polk County, Texas, *Architectural Control Committee of Oak Terrace Estates v. Ronald D. Mccormick and Jeraldine Pollard Mccormick*, No. 09-10-00495-CV[, 2011 Tex. App. LEXIS 9114] (Tex. App.—Beaumont [Nov. 17,] 2011[, no pet.) (mem. op.)], the Court of Appeals reversed the jury's finding of waiver and abandonment of the deed restrictions, limiting the jury's verdict to only the property of McCormick and his ability to keep the building he built without architectural approval:

A court may refuse to enforce a deed restriction because of the acquiescence by the landowners in violations so substantial that the acquiescence amounts to an abandonment of the restriction. *Cowling v. Colligan*, 158 Tex. 458, 312 S.W.2d 943, 945 (1958). The acquiescence may simply amount to a waiver of the right to enforce the restriction. *Id.* In determining waiver or abandonment in a deed restriction case, the factors to be considered include the number, nature, and severity of the existing violations, any prior enforcements of the restriction, and whether it is still possible to realize to a substantial degree of the benefits of the restriction despite the violations. *Finkelstein v. Southhampton Civic Club*, 675 S.W.2d 271, 278 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Trivial violations do not amount to abandonment, nor do they preclude enforcement of the restriction. *Cowling*, 312 S.W.2d at 946.

128. Texas Property Code §5.006 entitled "Attorney's Fees in Breach of Restrictive Covenant Action" provides "(a) In an action based on breach of a restrictive covenant pertaining to real property, the court

shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim."

129. The Plaintiff is the prevailing party who asserted an action based on breach of a restrictive covenant, and is entitled to recover its reasonable and necessary attorney's fees.

130. In *Arthur Anderson & Co. v. Perry Equipment*, 40 Tex. Sup. Ct.J. 591,945 S.W.2d 812 (Tex. 1997), the Texas Supreme Court listed eight factors of which a trier of fact must consider in determining the reasonableness and necessity of attorney's fees. These factors include:

1. the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

2. the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

3. ***The fee customarily charged in the locality for similar legal services;***

4. the amount involved and the results obtained;

5. the time limitations imposed by the client or by the circumstances;

6. the nature and length of the professional relationship with the client;

7. the experience, reputation and ability of the lawyer or lawyers performing the services; and

8. whether the fee is fixed or contingent on results obtained, or uncertainty of collection before the legal services have been rendered. ***(Emphasis added).***

131. The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a proceeding before the court. Section 38.004(1), Texas Civil Practice and Remedies Code.

132. A reasonable hourly rate for attorney's fees in the Polk County area is between $250.00 and $350.00 an hour depending on the experience of the attorney.

133. A reasonable and necessary amount of time to investigate, prepare for a bench trial, and conduct a bench trial in a lawsuit of this nature would be between 60 to 80 hours.

134. A reasonable and necessary attorney's fee for an appeal to the Texas Court of Appeals would be $10,000.00.

135. A reasonable and necessary attorney's fee for arguing a case before the Texas Court of Appeals would be $5,000.00.

136. A reasonable and necessary attorney's fee for filing an application for writ to the Texas Supreme Court would be $5,000.00.

137. A reasonable and necessary attorney's fee for briefing before the Texas [S]upreme Court would be $10,000.00.

138. A reasonable and necessary attorney's fee for arguing a case before the Texas Supreme Court would be $5,000.00.

139. Plaintiff is entitled to a declaratory judgment that the New Fence is in violation of the Restrictive Covenants.

140. Plaintiff is entitled to an injunction that the Defendants shall not have a fence that fails to comply with the Restrictive Covenants.

141. Plaintiff is entitled to attorney's fees and costs from Defendants.

142. Therefore, to that end, the Court finds Plaintiff is entitled to the following and enters judgment granting Plaintiff the same:

> (1) A declaration that Restrictions 2 and 28 of the Restrictive Covenants filed in Volume 644, Page 631, in the Polk County Real Property Records are valid, and do not violate Tex. Prop. Code § 202.023;

> (2) An injunction preventing Defendants from maintaining a fence that violates the Restrictive Covenants;

> (3) An order commanding Defendants to remove the New Fence within 45 days of this Order;

(4) Court costs in an amount to be determined by the Polk County District Clerk;

(5) Reasonable and necessary attorneys' fees in the amount of $14,532.75 plus $1,500.00 for trial, expenses of $1,644.92, plus reasonable and necessary attorneys' fees of $10,000.00 if the matter is appealed to the Court of Appeals, plus reasonable and necessary attorneys' fees arguing a case before the Texas Court of Appeals would be $5,000.00; reasonable and necessary attorney's fee for filing an application for writ to the Texas Supreme Court would be $5,000.00; reasonable and necessary attorney's fee for briefing before the Texas Supreme Court would be $10,000.00; and reasonable and necessary attorney's fee for arguing a case before the Texas Supreme Court would be $5,000.00; and

(6) Post Judgment interest at eight and one-quarter percent (8.25%) – the prime rate as published by the Board of Governors for the Federal Reserve System establishing, by the Notice of Rate Ceilings, dated on July 19, 2023, by the Consumer Credit Commissioner of Texas released a Notice of Rate Ceilings, Tex. Fin. Code §304.003.

SIGNED this 25th day of June, 2024.

## ANALYSIS

The Fence

As a general rule, a property owner may do as he chooses with his own property. *See JBrice Holdings, L.L.C. v. Wilcrest Walk Townhomes Ass'n*, 644 S.W.3d 179, 181 (Tex. 2022). As the Texas Supreme Court has explained, however, property owners may "'contract with relation to [their] property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal.'" *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 279 (Tex. 2018)

44

(citation omitted). Such restrictive covenants are subject to the general rules of contract interpretation but are interpreted narrowly in favor of the grantee. *Id.* at 280-85. We review a trial court's interpretation of a restrictive covenant de novo. *JBrice Holdings*, 644 S.W.3d at 183. "A covenant under review 'may not be enlarged, extended, stretched or changed by construction.'" *Id.* We review the trial court's findings of fact and conclusions of law under the same standard we apply to jury findings. *See Catalina v. Blaisdell*, 881 S.W.2d 295, 297 (Tex. 1994). "Findings of Fact by the trial court are always reviewable for legal and factual sufficiency of the evidence." *Koch Oil Co. v. Wibller*, 895 S.W.2d 854, 861 (Tex. App.—Beaumont 1995, writ denied).

Where an appellant challenges both the legal and factual sufficiency of the evidence, the appellate court should first review the legal sufficiency challenge. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). If an appellant is attacking the legal sufficiency of an adverse finding on which the appellant did not have the burden of proof, the appellant must show on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The reviewing court considers the evidence in the light most favorable to the finding to determine whether there is any probative evidence or reasonable inferences therefrom to support the finding. *Glover*, 619 S.W.2d at 401. The court disregards all evidence and inferences to the contrary. *Weirich v. Weirich*, 833

45

S.W.2d 942, 945 (Tex. 1992). When reviewing a factual sufficiency challenge, the appellate court considers and weighs all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 54 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

In this case, the applicable restrictive covenant prohibits property owners from constructing a fence "nearer to the front property line than the rear of the dwelling house." The Watsons' fence extension undisputedly is "nearer to the front property line than the rear of the dwelling house," but the Watsons contended that section 202.023 of the Property Code invalidated the restriction and precluded the Committee from enforcing this restriction. In response, the Committee argued that section 202.023 did not apply because it was not a property owners' association and because the Watsons had not demonstrated any need for the additional security that the extended fence might provide. The trial court agreed.

Section 202.023 of the Property Code states, in pertinent part:

(b) Except as provided by Subsection (c), a property owners' association may not adopt or enforce a restrictive covenant that prevents a property owner from building or installing security measures, including but not limited to a security camera, motion detector, or perimeter fence.

(c) This section does not prohibit a property owners' association from:

46

(1) prohibiting the installation of a security camera by a property owner in a place other than the property owner's private property;

(2) regulating the type of fencing that a property owner may install;

(3) prohibiting the placement of fencing that obstructs:

(A) A license area, as defined by a written license agreement or plat;

(B) a sidewalk in the public right-of-way or otherwise installed for public or community use; or

(C) a drainage easement or drainage area;

(4) requiring a driveway gate to be set back at least 10 feet from the right-of-way if the driveway intersects with a laned roadway, as defined by Section 541.302, Transportation Code; or

(5) if provided by a restrictive covenant, prohibiting the installation of fencing in front of the front-most building line of a dwelling.

Tex. Prop. Code Ann. § 202.023(b), (c).

To determine whether section 202.023 applies to the case before us, we must decide whether the Committee is a property owners association and whether the Watsons' fence is a perimeter fence. The Property Code defines a property owners association as:

"Property owners' association" means an incorporated or unincorporated association owned by or whose members consist primarily of the owners of the property covered by the dedicatory

47

instrument and through which the owners, or the board of directors or similar governing body, manage or regulate the residential subdivision, planned unit development, condominium or townhouse regime, or similar planned development.

Tex. Prop. Code Ann. § 202.001(2).

Using this definition, the Committee is a property owners' association. In the first instance, the Committee consists solely of Davis-Woods property owners and thereby satisfies the requirement that the Committee "consist primarily of the owners of the property covered by the dedicatory instrument[,]" through which the property owners "manage[d] or regulate[d] the residential subdivision[]" through the committee. The restrictive covenants support this conclusion, since the restrictive covenants not only permit the Committee to set the standard for landscaping maintenance and other land use,[1] but dictate:

> The committee shall function as representatives of all the property owners in the subdivision, and shall be authorized to enforce by appropriate proceedings the foregoing restrictions; enforce or release any lien imposed on any lot by reason of a violation of any of the foregoing restrictions; and approve or reject plans and specifications for buildings to be erected in said subdivision; and approve or reject any reasonable request of lot owners.

The Committee's power to represent the property owners, enforce restrictions and liens, and approve or deny plans or requests, constitutes the management and

---

[1] The restrictive covenants, which the Committee enforced, also regulate such things as the type and number of pets a property owner may possess, and the number and size of trees to remain on each lot.

48

regulatory authority contemplated by section 202.023. *See id.* § 202.023(c). The Committee cannot escape the import of section 202.023 by calling itself an Architectural Committee, since it is the Committee's substance and function, rather than its title, that determines its status as a property owners' association. *See Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 138-39 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting there was nothing within the statutory scheme that would first require a POA to be created under sections 201.005 or 204.006 before it otherwise could meet chapter 202's definition of a POA and that both chapters 202 and 204 provide their own distinct definition of a POA). *Compare* Tex. Prop. Code Ann. § 202.001(2), *with id.* § 204.004(b); *Rent-A-Center, Inc. v. Hegar*, 468 S.W.3d 220, 224 (Tex. App.—Austin 2015, no pet.) (citation omitted) (holding that the substance of a transaction prevails over its form).

Even if, as the Committee argued and the trial court found, section 202.023 was not yet in effect when the Watsons built their fence, section 202.023 nonetheless applies to the Watsons' fence, since section 202.023 applies to both adopting and enforcing a restrictive covenant that prevents a property owner from building a perimeter fence. *See* Tex. Prop. Code Ann. § 202.023(b).

In *Corbin v. Commons of Lake Houston Property Owners Association*, our sister court addressed a similar issue. 696 S.W.3d 267, 269 (Tex. App—Houston [14th Dist.] 2024, pet. denied). The *Corbin* homeowners sued the property owners'

49

association to enforce a covenant that disallowed fencing along an easement, and the trial court held that although the preexisting covenant preventing a perimeter fence remained valid, the property owners' association could no longer enforce the covenant in the wake of section 202.023. *Id.* We follow our sister court's example and decide that although the restriction is valid, section 202.023 prevents the Committee from enforcing it. *See id.* Therefore, even if, as the Committee and the trial court believed, section 202.023 was not yet effective when the Watsons built the fence, the Committee cannot enforce the restriction in question. *See* Tex. Prop. Code Ann. § 202.023(b).

The trial court's finding that the Committee could enforce the fence restriction because the Watsons did not prove a need for the security the fence provided is misplaced. The statute defines a perimeter fence as a security measure that a property owners' association may not prohibit. *See id.* Since the statute is silent on a need for security measures, the trial court exceeded the scope of the statute in requiring the Watsons to prove a need for extra security and in ruling against them when they did not do so. Accordingly, if the Watsons' fence is a perimeter fence, the Committee may not enforce the cited restriction against it. *See Corbin*, 696 S.W.3d at 269.

The *Corbin* court noted that the statute does not define "perimeter," and it therefore applied the "ordinary or common meaning[]" of "perimeter" to determine that a perimeter fence is a fence around the "boundary or outer limits of a property."

50

*Id.* at 273. Under *Corbin's* definition, the Watsons' fence is a perimeter fence and the Committee consequently may not prohibit it. Since the record lacks both legally and factually sufficient evidence to support the trial court's Findings of Fact and Conclusions of Law regarding the fence, we must reverse its decision. We sustain the Watsons' appellate issue as to the fence.

Attorney's Fees

Section 5.006 of the Property Code states, in part:

(a) In an action based on breach of a restrictive covenant pertaining to real property, the court shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim.

Tex. Prop. Code. Ann. § 5.006(a).

Since the Committee asserted the action and was the prevailing party in the trial court, it was entitled to attorney's fees pursuant to this statutory section, and the trial court awarded those fees. *See id.* Since the Committee is no longer the prevailing party, we must reverse the trial court's fee award and render a decision that the Committee take nothing.

Since the Watsons are now the prevailing party, we examine their entitlement to attorney's fees and court costs. The Watsons were not the "party who asserted the action" and, as such, they may not be awarded fees under section 5.006. *See id.* However, the Committee and the Watsons both sought relief under section 37.004

51

of the Civil Practice and Remedies Code (the Uniform Declaratory Judgments Act).

*See* Tex. Civ. Prac. & Rem. Code § 37.004(a). Section 37.004 states:

> (a) A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a).

In a declaratory judgment proceeding, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id*. § 37.009. Had the trial court determined the amount of a reasonable and necessary fee for the Watsons' attorney, we could render a decision in the Watsons' favor awarding them a reasonable and necessary fee. Since the trial court did not do so, we must remand the matter to the trial court which may determine whether a reasonable and necessary fee award should be granted in any amount, plus court costs and other relief to which the Watsons are entitled. *See Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 706-07 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (allowing attorney's fees to be awarded under the Declaratory Judgments Act).

## CONCLUSION

Having concluded the trial court erred in deciding that the Committee was not a POA and that section 202.023 of the Texas Property Code did not apply, we render

the judgment that the trial court should have rendered: the Committee is a POA and thus may not enforce its restriction against the installation of Watsons' perimeter fence. We remand this case to the trial court for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(c).

REVERSED AND RENDERED IN PART; REMANDED IN PART.

JAY WRIGHT<br>Justice

Submitted on April 15, 2026
Opinion Delivered June 25, 2026

Before Golemon, C.J., Wright and Chambers, JJ.